T.C. Memo. 1999-119


UNITED STATES TAX COURT


ESTATE OF ALICE FRIEDLANDER KAUFMAN, DECEASED,
JAMES J. MORRISSEY, ALAN S. BERCUTT AND DIANE FANTL,
CO-EXECUTORS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 17050-97.                    Filed April 6, 1999.


        S is a family-owned corporation, and D's estate
(E) includes 46,020 shares of S's class A stock.  E's
shares represent 19.86 percent of S's total outstanding
shares and is the largest block of S stock owned by one
person.  E reported on its Federal estate tax return
that the fair market value of these shares was $29.77
each on the applicable valuation date.  E primarily
based its value on two sales of S stock that took place
approximately 2 months after the valuation date; two
members of D's extended family sold their interests in
S (4.67 and 3.25 percent, respectively) to a third
member without investigating the reasonableness of the
sale price and without negotiation.  R determined that
the fair market value of E's stock was $70.79 per
share.
        Held:  The fair market value of E's stock on the
applicable valuation date was $56.50 per share.  The
sales upon which E relies are not indicative of the
value of E's stock; among other things, the sellers
were not knowledgeable of the value of their stock, and

their stock interests lacked sufficient similarity to E's interest to serve as a proper measure of value.

<u>David J. Duez</u>, <u>Matthew P. Larvick</u>, <u>James J. Morrissey</u>, and <u>Kevin J. Feeley</u>, for petitioners.

<u>John Q. Walsh</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  Petitioners petitioned the Court to redetermine a Federal estate tax deficiency of $1,038,257. Following concessions, we must decide the fair market value of the subject stock on April 14, 1994.  Respondent determined that the fair market value was $70.79 per share.  Petitioners argue that the fair market value was $29.77 per share.  We hold that the fair market value was $56.50 per share.  Unless otherwise stated, section references are to the Internal Revenue Code as applicable herein, and Rule references are to the Tax Court Rules of Practice and Procedure.  References to decedent are to Alice Friedlander Kaufman, and references to the estate are to decedent's estate.  Percentages are rounded to the nearest one-hundredth.  Monetary amounts are rounded to the nearest penny.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits submitted therewith are incorporated herein by this reference.  Decedent died on October 14, 1993, at the age of 78, while a resident of

California.  The estate's coexecutors are James J. Morrissey,
Alan S. Bercutt, and Diane Fantl.  When the petition was filed,
Mr. Morrissey resided in New York, and Mr. Bercutt and Ms. Fantl
resided in California.

Seminole Manufacturing Co. (Seminole) was incorporated under
the laws of the State of Oklahoma.  Seminole's equity consists of
two classes of nonpublicly traded common stock.  One class (class
A) has 213,940 shares outstanding.  The other class (class B) has
17,800 shares outstanding.[1]  None of the class A shares are
subject to a shareholders' agreement, right of first refusal,
option, or other restriction on transfer that would eliminate or
otherwise limit a shareholder's ability to transfer them.  Except
as noted infra, the record does not disclose whether a transfer
of the Class B shares is restricted or whether the attributes of
those shares are different from those of the class A shares.[2]

Owners of Seminole stock on the applicable valuation date
were as follows:

---

[1] In addition to the total outstanding shares of 231,740,
Seminole has other shares, which it holds as treasury stock.

[2] As discussed below, the Class B shares that were held by
an employee of Seminole were required to be redeemed when the
employee severed his employment.  We do not understand this fact
to mean that a transfer of the Class B shares was otherwise
restricted.  We find nothing in the record that indicates that an
employee could not transfer his shares during his employment.
(Indeed, it appears that one employee/shareholder, James D. High,
transferred 2,600 shares to his wife, Rose M. High.)  Of course,
any shares transferred by an employee would be subject to
redemption from the transferee if and when the employee severed
his employment with Seminole.

| Shareholder | Class A Shares | Class B Shares | Ownership Percentages A | B | Total |
|---|---|---|---|---|---|
| Decedent's Estate | 46,020 | -- | 21.51 | -- | 19.86 |
| A. Max Weitzenhoffer, Jr. | 40,080 | -- | 18.73 | -- | 17.30 |
| Elizabeth Weitzenhoffer Blass | 35,500 | -- | 16.59 | -- | 15.32 |
| Clara Weitzenhoffer, trustee of the Clara Weitzenhoffer trust | 31,800 | -- | 14.86 | -- | 13.72 |
| John Gunzler | 9,600 | 16,400 | .49 | 92.13 | 11.22 |
| Jerome K. Altshuler, either individually or as executor | 12,960 | -- | 6.06 | -- | 5.59 |
| Edmund M. Hoffman | 10,000 | -- | 4.67 | -- | 4.32 |
| Decedent and Diane K. Fantl, trustees under will of Julia Kaufman | 7,320 | -- | 3.42 | -- | 3.16 |
| Jacquelyne Weitzenhoffer Branch | 6,960 | -- | 3.25 | -- | 3.00 |
| Diane K. Fantl | 5,740 | -- | 2.68 | -- | 2.48 |
| Frederick W. Reeves | 2,000 | 1,400 | .94 | 7.87 | 1.47 |
| Rose M. High | 2,600 | -- | 1.22 | -- | 1.12 |
| James D. High | 2,000 | -- | .94 | -- | .86 |
| Decedent, trustee of the Josephine Kaufman trust | 960 | -- | .45 | -- | .41 |
| William J. Threadgill | 400 | -- | .19 | -- | .17 |
| | 213,940 | 17,800 | 100.00 | 100.00 | 100.00 |

Most of these shareholders were related by blood or by marriage to the Weitzenhoffer family. The only shareholders who were not so related are Messrs. Reeves, Threadgill, and High, and Ms. High. Mr. Reeves has been associated with Seminole and its wholly owned subsidiary, Kazoo, Inc. (Kazoo), for more than 20 years, serving as Kazoo's president, Seminole's vice president, and a member of both boards. Mr. Threadgill is Seminole's secretary, a member of its board, and its longtime legal counsel.[3] Mr. High is an employee of Seminole. Ms. High is Mr. High's wife. The 11 shareholders who were related to the Weitzenhoffer family are identified in bold print in the appendix, where we set forth each shareholder's relationship to the Weitzenhoffer family.

---

[3] In addition to Messrs. Reeves and Threadgill, Seminole's directors on the applicable valuation date were A. Max Weitzenhoffer, Elizabeth Weitzenhoffer Blass, and John Gunzler.

Seminole's sole asset is Kazoo stock.  Seminole, through Kazoo, manufactures men's and women's uniforms and sells this apparel wholesale to stores and to industrial launderers which rent the garments to customers.  Seminole's[4] apparel, known as career apparel, is mainly worn by rental car agents, flight attendants, hotel employees, and middle management or supervisory personnel in large companies.  Seminole does not sell retail, and it does not sell directly to the public.  Of its approximately 4,000 customers, 10 accounted for more than 40 percent of Seminole's 1993 sales.  Seminole's industry is highly competitive, and Seminole is the industry's largest seller of professional uniforms.  Approximately 25 million American workers wear uniforms daily, and the annual revenues of the uniform industry total approximately $5 billion.

In the late 1980's, Seminole had a second business:  a pants operation in Mississippi that sold garments to mass merchandisers such as Wal-Mart and J.C. Penney.  Seminole sold this operation in 1991 mainly because the operation was doing poorly.  A. Max Weitzenhoffer (Max Weitzenhoffer) and John Gunzler transferred approximately $1 million in cash to Seminole after the sale, and Seminole has been profitable ever since.

Seminole's net sales were $33,790,382 (after adjustment for discontinued operations) for 1990, $34,517,026 for 1991, $42,869,030 for 1992, and $46,710,904 for 1993.  Seminole's gross

---

[4] The parties continually refer to Kazoo as Seminole.  So do we.

profit was $8,084,138 (after adjustment for discontinued operations) for 1990, $8,079,863 for 1991, $9,084,921 for 1992, and $10,204,757 for 1993.  Seminole's income from operations before income tax expense was $3,592,509 (after adjustment for discontinued operations) for 1990, $3,073,465 for 1991, $2,739,020 for 1992, and $3,852,222 for 1993.  Seminole's income from operations after income tax expense was $2,272,509 (after adjustment for discontinued operations) for 1990, $1,923,465 for 1991, $1,801,020 (before the cumulative effect of an accounting change) for 1992, and $2,570,085 (before the cumulative effect of an accounting change) for 1993.  Seminole's net income (loss) was ($542,446) (after adjustment for discontinued operations) for 1990, ($5,042,168) for 1991, $1,551,209 for 1992, and $2,570,085 for 1993.  Seminole paid cash dividends of $116,245 in 1992 and $231,740 in 1993.  In 1991, Seminole budgeted dividends for 1993, 1994, 1995, and 1996 of $240,000, $300,000, $360,000, and $480,000, respectively.

In 1994, Seminole had two basic channels of distribution, one in which it sold garments to industrial launderers who in turn rented the garments to customers of their own, and the other in which it sold garments to uniform stores for resale.  At that time, more than one-half of Seminole's business was from its industrial laundry sales.  In 1994, the industrial laundry industry began to undergo a radical change in that many of the businesses in the industry were acquired by or merged with other

businesses.  This heavy volume of business combinations has continued to date.

Steven M. Smith is a certified public accountant who provides accounting, tax, and consulting services to Seminole, Max Weitzenhoffer, and other clients.[5]  In 1993, Mr. Smith and Max Weitzenhoffer decided that Merrill Lynch should appraise the value of a minority interest in Seminole so that Max Weitzenhoffer could offer to buy the shares of those shareholders who were not interested in the company.  Merrill Lynch prepared a report dated and delivered to Max Weitzenhoffer on July 5, 1994, which valued shares of Seminole's common stock constituting a minority interest at $29.77 each as of December 8, 1993.  Merrill Lynch assumed, among other things, that Seminole had 16 shareholders and that the per-share value of each shareholder's shares was the same.  Merrill Lynch did not distinguish or discuss the difference between the class A shares and the class B shares.

Before receiving Merrill Lynch's report, Max Weitzenhoffer asked some of Seminole's shareholders if they would sell their stock at $29.70 per share.  Mr. Smith had advised Max Weitzenhoffer that purchases through the will of his grandmother, Irma Rosenthal, would have tax advantages.  On May 12, 1994, Mr. Hoffman, who was approximately 72 years old, accepted Max Weitzenhoffer's offer and sold his stock to the Irma Rosenthal

---

[5] In addition to his work for Seminole, Max Weitzenhoffer produces theater in New York and London.

Trust for $29.70 per share.  Mr. Hoffman had received his stock as a gift or inheritance from Mark Weitzenhoffer.  Mr. Hoffman sold his stock to the trust without investigating the reasonableness of the sale price, without hiring an appraiser, and without negotiation.

On June 16, 1994, Ms. Branch, who was approximately 67 years old, sold her 6,960 shares of Seminole stock to Irma Rosenthal's estate for $29.70 per share.  Ms. Branch had inherited all of these shares.  Ms. Branch sold her stock after writing Max Weitzenhoffer complaining that she never received Seminole's annual report and that she never knew about its operation. Ms. Branch regularly complained to Max Weitzenhoffer that she was not kept abreast of Seminole's business.  He then wrote her offering to buy her shares for $29.70 each.  He represented in the letter that Merrill Lynch had appraised the stock at that price, that he had offered the same price to Mr. Hoffman, and that Mr. Hoffman had accepted.  Ms. Branch sold her stock without having it appraised, without investigating its worth, and without negotiation.  She had no documentary information except for the letter from Max Weitzenhoffer.

A Federal estate tax return was filed for the estate on July 14, 1994, electing and using the alternate valuation date of April 14, 1994.  The return valued the estate's 46,020 class A shares of Seminole at $29.77 per share, which, the return stated, was also their value on the date of death.  The return stated:

> VALUATION OF THE SEMINOLE MANUFACTURING COMPANY WAS
> ESTABLISHED BY MERRILL LYNCH BUSINESS ADVISORY SERVICES
> AT $ 29.77.  IN ADDITION, THERE WERE TWO ARMS-LENGTH
> SALES IN WHICH MAX WEITZENHOFFER PURCHASED 10,000
> SHARES FROM EDMOND M HOFFMAN AND 6,960 SHARES FROM
> JACQULINE [sic] BRANCH.  THE TRANSACTION PRICE IN BOTH
> INSTANCES WAS $ 29.77.

The notice of deficiency reflects respondent's determination that the estate's shares were worth $70.79 each.

Seminole's headquarters are in Kalamazoo, Michigan. Seminole owns the 115,000-square-foot manufacturing/distribution facility in which its operations are located and an adjoining 20-acre parcel of land that is not needed for operations or expansion.  Representatives of Merrill Lynch discussed the value of the adjoining land with Seminole's management when it prepared its appraisal report, and, for purposes of the report, Merrill Lynch assumed that the land was worth $10,000 an acre.

Seminole has always been a family business, and it is obligated to redeem the stock held by shareholder employees upon termination of their employment.  The record does not disclose the price at which these shares must be redeemed or other terms of this redemption obligation.  The record does not disclose which shareholders are employees, with the exception of Messrs. Reeves, Gunzler, Threadgill, and High.  Seminole has approximately 150 employees.  Approximately 25 of them are salaried administrative personnel, 75 are warehouse personnel, and approximately 50 work in Seminole's in-house manufacturing division.

As of the beginning of the second quarter of 1994, the U.S. economy had a largely positive outlook. It had enjoyed 12 straight quarters of economic growth and was experiencing some of the lowest interest and inflation rates in more than two decades. As of the alternate valuation date, market growth for the uniform industry was anticipated; the career apparel sector of the uniform industry was growing rapidly, as companies learned the benefits of easily identifiable employees and advertising created by the professional image.

Seminole budgeted approximately $1.5 million to be spent in its 1994 fiscal year on expansion and a new computer system.

OPINION

We must determine the fair market value of the estate's Seminole stock on the applicable valuation date. Fair market value is a factual determination, and the trier of fact must weigh all relevant evidence of value and draw appropriate inferences. See Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. National Grocery Co., 304 U.S. 282, 294 (1938); Symington v. Commissioner, 87 T.C. 892, 896 (1986); Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). Fair market value is measured on the applicable valuation date, which, in this case, is 6 months after the day decedent died. See sec. 2032(a); Estate of Proios v. Commissioner, T.C. Memo. 1994-442; see also Pabst Brewing Co. v. Commissioner, T.C. Memo. 1996-506. When the Commissioner determines fair market value, as is the case at hand, taxpayers

generally bear the burden of proving this value wrong.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Leonard Pipeline Contractors, Ltd. v. Commissioner, 142 F.3d 1133, 1136 (9th Cir. 1998), revg. on another issue and remanding T.C. Memo. 1996-316; Estate of Jung v. Commissioner, 101 T.C. 412, 423 (1993); Estate of Gilford v. Commissioner, 88 T.C. 38, 51 (1987). To meet this burden, the record must contain enough evidence to support a finding contrary to the Commissioner's determination (so-called burden of coming forward), and taxpayers must demonstrate the merits of their claim by at least a preponderance of the evidence (so-called burden of persuasion).  See Estate of Gilford v. Commissioner, supra at 51; see also Fed. R. Evid. 301. If taxpayers such as petitioners fail either burden, the Commissioner will prevail.  See Estate of Gilford v. Commissioner, supra at 51; see also Rockwell v. Commissioner, 512 F.2d 882, 885 (9th Cir. 1975), affg. T.C. Memo. 1972-133; American Pipe & Steel Corp. v. Commissioner, 243 F.2d 125, 126 (9th Cir. 1957), affg. 25 T.C. 351 (1955).

An arm's-length sale of property close to a valuation date is indicative of its fair market value.  See Ward v. Commissioner, 87 T.C. 78, 101 (1986); Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982); Duncan Indus., Inc. v. Commissioner, 73 T.C. 266, 276 (1979).  If actual arm's-length sales are not available, fair market value represents the price that a hypothetical willing buyer would pay a hypothetical willing seller, both persons having reasonable knowledge of all

relevant facts and neither person compelled to buy or to sell.
See <u>United States v. Cartwright</u>, 411 U.S. 546, 551 (1973); <u>Snyder</u>
<u>v. Commissioner</u>, 93 T.C. 529, 539 (1989); <u>Estate of Hall v.</u>
<u>Commissioner</u>, 92 T.C. 312, 335 (1989); see also <u>Gillespie v.</u>
<u>United States</u>, 23 F.3d 36 (2d Cir. 1994); <u>Collins v.</u>
<u>Commissioner</u>, 3 F.3d 625, 633 (2d Cir. 1993), affg. T.C. Memo.
1992-478; sec. 20.2031-1(b), Estate Tax Regs.  The views of both
hypothetical persons must be taken into account, and the
characteristics of each hypothetical person may differ from the
personal characteristics of the actual seller or a particular
buyer.  See <u>Estate of Bright v. United States</u>, 658 F.2d 999,
1005-1006 (5th Cir. 1981); <u>Kolom v. Commissioner</u>, 644 F.2d 1282,
1288 (9th Cir. 1981), affg. 71 T.C. 235 (1978); <u>Estate of</u>
<u>Newhouse v. Commissioner</u>, 94 T.C. 193, 218 (1990).  Focusing too
much on the view of one hypothetical person, to the neglect of
the view of the other, is contrary to a determination of fair
market value.  See, e.g., <u>Pabst Brewing Co. v. Commissioner</u>,
<u>supra</u>; <u>Estate of Scanlan v. Commissioner</u>, T.C. Memo. 1996-331,
affd. without published opinion 116 F.3d 1476 (5th Cir. 1997);
<u>Estate of Cloutier v. Commissioner</u>, T.C. Memo. 1996-49.  The
hypothetical willing buyer and the hypothetical willing seller
both aim to maximize their profit from the hypothetical sale of
the property.  See <u>Estate of Watts v. Commissioner</u>, 823 F.2d 483,
486 (11th Cir. 1987), affg. T.C. Memo. 1985-595; <u>Estate of</u>
<u>Simplot v. Commissioner</u>, 112 T.C. ___ (1999).

Petitioners point the Court to the sales by Mr. Hoffman and Ms. Branch and argue that these sales establish that the per-share value of the estate's stock equaled the value at which these sales were consummated; i.e., $29.70 per share. Petitioners vehemently argue that these sales are the most accurate measure of value because, petitioners state, both sellers were knowledgeable persons who were under no compulsion to sell.

We disagree with petitioners that either sale is indicative of the value of the estate's stock. See Duncan Indus., Inc. v. Commissioner, supra at 278. The estate's holdings were the largest single ownership of Seminole stock by one person, and the isolated sales relied upon by petitioners, which constituted 3.25- and 4.67-percent interests, are not sufficiently similar to the estate's much larger 21.51-percent interest to make their sale price representative of the value of the estate's stock. Nor was either sale made by a person who was reasonably informed on the date of sale as to the relevant facts surrounding the value of the underlying property. Neither Mr. Hoffman nor Ms. Branch performed any meaningful financial review as to the value of his or her stock. Petitioners point the Court to the affidavits of Mr. Hoffman and Ms. Branch, both of which were prepared more than 2 years after the date on which Ms. Branch sold her stock. In those affidavits, she and Mr. Hoffman assert that they reviewed the Merrill Lynch report before selling their stock. We find these assertions incredible. Merrill Lynch had

not yet finished its report as of June 16, 1994.  As discussed
infra, the sellers also testified in this Court that they did not
see the report before selling their stock.

That testimony speaks loudly to the fact that they were not
knowledgeable sellers who aimed to realize the fair market value
of their stock.  Ms. Branch testified:

> Q  Would it be fair to say that at the time
> of your sale of your Seminole stock you did
> not know its precise value?
>
> A  No.  I mean--
>
> Q  It would be fair to say that you didn't
> know its value?
>
> A  No, I had no idea what the value was.
> It's a family business.  How are you going to
> know what the value of a family business is?
>
>      *    *    *    *    *    *    *
>
> Q  Ms. Branch, at the time of the sale of
> your Seminole stock, do you have any
> recollection as to whether the--as to whether
> you had a valuation report for Seminole--for
> your Seminole stock?
>
> A  I did not get the Merrill Lynch report
> that's mentioned in here, no.
>
> Q  So you never had the Merrill Lynch report.
>
> A  No, but the letter quoted Merrill Lynch as
> having appraised the stock at that price.
>
>     THE COURT:  Which letter are you talking
> about?
>
>     THE WITNESS:  The one from Max offering
> to buy my shares.
>
>      *    *    *    *    *    *    *

THE COURT: And how did you determine the correct price for you to sell the stock at?

THE WITNESS: Well, he made an offer of so much--of X, you know, dollars.

THE COURT: Who's he? Who's he? You say he made--

THE WITNESS: Max offered me $206,000, and it seemed like a pretty good--you know, a nice sum of money. So I figured, okay, take it and get out of Seminole * * *

THE COURT: Other than the fact that it seemed like a nice sum of money, did you make any other consideration or determination as to whether that was a fair price?

THE WITNESS: No. I just took his word that he said Merrill Lynch had appraised it at that.

Mr. Hoffman testified similarly:

Q Was there a time when you came to own stock of the Seminole Manufacturing Company?

A Yes, and that was during the lifetime of Mark Weitzenhoffer. And I don't know the exact date, but probably during the 1960s.

Q Approximately how many shares did you acquire?

A 10,000 shares.

Q Do you recall how you acquired those?

A I just think that Mark Weitzenhoffer gave them to me.

Q So they were a gift?

A Yes.

*    *    *    *    *    *    *

Q  Was there a time in which you came to sell the shares you owned in Seminole Manufacturing Company?

A  Yes.

Q  Do you remember approximately when that was?

A  1974, I think.  And I think--

Q.  '74 or '94?

A  '94, I mean.  Excuse me.

*    *    *    *    *    *    *

Q  And would you please describe for us the circumstances--or how you came--how that transaction came about?

A  Well, Mark had--when Mark was alive-- Mark Weitzenhoffer was alive--and he passed away in 1970--he gave stock in--I think out of his estate, and that's where I got my shares.

And finally I decided one day that there wasn't anything for me to do with the Seminole Manufacturing Company, which Mark had headed.  And so I tried to find a buyer, and I did find a buyer that bought it at $297 [$29.70] a share, or a total of $297,000.

Q  Do you recall what steps you took to find a buyer?

A  Just asked somebody in the company if they would acquire it.

*    *    *    *    *    *    *

Q  Do you recall what, if any, investigation you undertook at the time as to the reasonableness of the sale price?

A  I didn't--I thought it was reasonable, and I decided that I could use the money to do something else, and I went ahead and sold it.

*   *   *   *   *   *   *

THE COURT:  Did you rely upon the [Merrill Lynch] appraisal in order to decide whether or not the price that you were to receive was fair?

THE WITNESS:  I didn't do that.  I--my point there was that I was trying to sell the Seminole stock and I thought I had a price that I would accept.

Having concluded that the record is devoid of an arm's-length sale upon which we may measure the value of the estate's stock, we proceed to determine the stock's value using a two-step process established by this Court's jurisprudence.  See Mandelbaum v. Commissioner, T.C. Memo. 1995-255, affd. without published opinion 91 F.3d 124 (3d Cir. 1996), and the cases cited therein.  First, we must estimate the value of the stock as if it were publicly traded.  We do so, if possible, by reference to the value of the listed stock of like corporations engaged in the same or a similar line of business.  See sec. 2031(b); Estate of Hall v. Commissioner, 92 T.C. at 336; Mandelbaum v. Commissioner, supra.  Like corporations are determined by reference to the subject corporation's age, business, product line, and gross receipts.  See Estate of Hall v. Commissioner, supra at 336; Mandelbaum v. Commissioner, supra.  We must also estimate the stock's value indirectly by reference to the subject corporation's net worth, its prospective earning power, its dividend-earning capacity, its goodwill, its management, its position in the industry, the economic outlook for its industry, the degree of control represented by the block of its stock to be

valued, and the amount and type of its nonoperating assets if not considered elsewhere.  See Estate of Hall v. Commissioner, supra at 336; Estate of Andrews v. Commissioner, 79 T.C. at 940; Estate of Cloutier v. Commissioner, T.C. Memo. 1996-49; sec. 20.2031-2(f), Estate Tax Regs.; Mandelbaum v. Commissioner, supra.

Second, we must determine by how much, if any, our estimated publicly traded value should be discounted to reflect the fact that the stock is unlisted and not easily marketable.  See Mandelbaum v. Commissioner, supra; see also Estate of Cloutier v. Commissioner, supra (marketability discount generally represents the additional price that an unlisted share would command if it were freely traded).  Factors to consider to determine the applicability and amount of a marketability discount include: (1) The value of the subject corporation's privately traded securities vis-a-vis its publicly traded securities (or, if the subject corporation does not have stock that is traded both publicly and privately, the cost of a similar corporation's public and private stock); (2) an analysis of the subject corporation's financial statements; (3) the corporation's dividend-paying capacity, its history of paying dividends, and the amount of its prior dividends; (4) the nature of the corporation, its history, its position in the industry, and its economic outlook; (5) the corporation's management; (6) the degree of control transferred with the block of stock to be valued; (7) any restriction on the transferability of the corporation's stock; (8) the period of time for which an investor

must hold the subject stock to realize a sufficient profit; (9) the corporation's redemption policy; and (10) the cost of effecting a public offering of the stock to be valued; e.g., legal, accounting, and underwriting fees. Mandelbaum v. Commissioner, supra.

Each party called a witness whom they and he asserted was an expert on valuation and would help the Court determine the fair market value of the estate's stock. Petitioners called Bret Tack, accredited senior appraiser, a principal of the firm of Houlihan Valuation Advisors. Mr. Tack graduated from college in 1985, and he has continued to work in the valuation field ever since. We recognized Mr. Tack as an expert on business valuation, and we accepted his reports into evidence. His initial report analyzed the fair market value of the estate's stock as of April 14, 1994, concluding that the estate's stock interest was a minority, noncontrolling interest that had a fair market value on that date of $30.85 per share. He reached his conclusion after analyzing two of the three relevant valuation methods; namely, the market comparative method and the discounted cash-flow method. He did not analyze the third method; i.e., the net asset value method. His supplemental report discussed the marketability discount in the setting of the Mandelbaum factors, concluding that the 35-percent discount factored into his $30.85 per-share value was consistent with a Mandelbaum analysis.

Respondent called William K. Fowler, A.M., a financial analyst employed by the Internal Revenue Service. Mr. Fowler has

performed more than 700 appraisals since he entered the valuation field in 1986, and he is an accredited member of the American Society of Appraisers and the Institute of Business Appraisers. We recognized Mr. Fowler as an expert on business valuation, but we expressed our concern that he might be biased because he was a full-time employee of the Commissioner. Mr. Fowler's initial report ascertained the value of Seminole stock as of December 8, 1993, the date for which the Merrill Lynch report had set forth a value. We did not admit this report into evidence. We held it was irrelevant because the December 8, 1993, valuation date set forth therein was too far removed from the applicable April 14, 1994, valuation date. We did admit into evidence his supplemental report, limiting its admissibility to a rebuttal of Mr. Tack's supplemental report. Mr. Fowler's supplemental report analyzed the marketability discount in the context of the Mandelbaum factors, stating that an analysis of those factors favored a marketability discount of 15 percent.

We have wide discretion when it comes to accepting expert testimony. Sometimes, an expert will help us decide a case. See, e.g., Booth v. Commissioner, 108 T.C. 524, 573 (1997); Trans City Life Ins. Co. v. Commissioner, 106 T.C. 274, 302 (1996); see also M.I.C. Ltd. v. Commissioner, T.C. Memo. 1997-96; Proios v. Commissioner, T.C. Memo. 1994-442. Other times, he or she will not. See, e.g., Estate of Scanlan v. Commissioner, T.C. Memo. 1996-331; Mandelbaum v. Commissioner, supra. We weigh an expert's testimony in light of his or her qualifications and with

proper regard to all other credible evidence in the record. See Ebben v. Commissioner, 783 F.2d 906, 909 (9th Cir. 1986), affg. in part and revg. in part on another issue T.C. Memo. 1983-200; Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970). We may accept or reject an expert's opinion in toto, or we may pick and choose the portions of the opinion which we choose to adopt. See Helvering v. National Grocery Co., 304 U.S. at 294-295; Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Parker v. Commissioner, 86 T.C. 547, 562 (1986); see also Pabst Brewing Co. v. Commissioner, T.C. Memo. 1996-506. The mere fact that the position of one party may be unsupported by expert testimony does not necessarily mean that the other party's position that is so supported will prevail. See Estate of Scanlan v. Commissioner, supra.

Mr. Tack's reports do not persuade us that the value of the estate's stock was the amount stated therein. He relied repeatedly on the unverified representations of Seminole's management, and we are unable to verify the accuracy or completeness of those representations. He also relied on faulty assumptions to arrive at his value, neglected to analyze key indicia of value (including Seminole's certificate of incorporation and bylaws), and assumed erroneously that the sales by Mr. Hoffman and Ms. Branch were at arm's length. Mr. Tack took into account the price at which Mr. Hoffman and Ms. Branch

sold their shares to reach his conclusion of value.[6]  Mr. Tack applied his primary valuation method, i.e., the discounted cash-flow method, in a manner that is irreconcilable with our understanding of that method.  See Estate of Jung v. Commissioner, 101 T.C. at 424 n.6.

We proceed to discuss in more detail some of the problems we have with his reports.  First, with respect to his analysis of like public corporations engaged in the same or a similar line of business, we do not find enough information on these corporations to decide whether they are sufficiently similar to Seminole to permit a proper valuation analysis, or whether another corporation is better suited for this analysis.  He tells us in his initial report that several hundred companies in the business of manufacturing uniforms have revenues under $10 million, that approximately 30 such companies have revenues between $30 million and $100 million, and that a few such companies have revenues in excess of $100 million.  Yet, he uses as his similar companies for Seminole, a company the revenues of which were approximately $47 million in 1993, six public corporations the revenues of which for their taxable years ended on or near December 31, 1993, ranged from a low of $130.5 million to a high of $505.7 million.

---

[6] Upon redirect examination, Mr. Tack testified that he did not take these sales into account.  This testimony, however, is contradicted by his initial report, which states specifically that he did consider these sales.  That report states:  "These transactions [the sales by Mr. Hoffman and Ms. Branch] were consummated at the Merrill Lynch appraised value and have been considered in our analysis."

He has not explained adequately why he chose as his similar companies six corporations all of whose revenues more than doubled the revenues of Seminole. He also fails to explain why he did not consider RedKap, a corporation that he tells us is a subsidiary of a publicly traded company and the main competitor to Seminole.

Nor has Mr. Tack adequately explained how he concluded that the industry of his similar corporations was the same as Seminole's industry. He could have, for example, referenced the standard industry code (or codes) that is (or are) applicable to Seminole and his similar corporations. He did not. Corporations which do business in a particular industry are generally classified under the same industry code, and experts in valuation cases typically refer to the standard industry code to verify that the industry of the public corporations which they choose as similar to a corporation before us is the same. Although Mr. Tack states in his initial report that he selected as his similar corporations those public corporations that are "most similar to the Company [Seminole] from an investment standpoint", a phrase of uncertain meaning, we are not persuaded that his proffered corporations are similar to Seminole as to age, business, product line, and gross receipts. A proper valuation report must contain enough data on each similar corporation to allow the Court to make an informed, independent decision as to whether the corporations are sufficiently similar to the subject corporation to perform a proper valuation analysis. The mere fact that a

public corporation may be similar to the subject corporation in some regards does not mean that it is a good indicium of the latter's value.

Second, Mr. Tack did not analyze all three valuation methods. While he recognized all three methods and the fact that all three methods enter into a determination of fair market value, he failed to ascertain a value under the net asset method. He noted the fact that Seminole invested significantly in tangible assets but concluded, without adequate explanation, that "an investor would evaluate Seminole based primarily upon the aggregate earnings and cash-flow generating capability of the Company's combined assets, rather than on the basis of individual asset values." Valuation experts must thoroughly analyze all applicable methods of valuation, and they may not simply assert without sufficient explanation that they have concluded that a particular method is irrelevant.[7] That Mr. Tack failed to perform a net asset analysis is not unremarkable, seeing that he reviewed nothing that would have enlightened him on the fair market value of Seminole's assets, including what we imagine is a large dollar amount of goodwill that has attached to Seminole's prestigious name over its more than 60 years of operation. If

---

[7] Upon redirect examination, Mr. Tack attempted to rationalize his failure to analyze the net asset value method by stating boldly that: (1) Seminole is worth more as a going concern on account of its earnings and (2) one cannot apply the net asset method to ascertain the value of a minority interest. We find these statements unpersuasive as reasons for not analyzing Seminole's net asset value.

the fair market value of Seminole's net assets on the applicable valuation date were greater than their value as integral parts of Seminole's business, a hypothetical buyer would consider buying the estate's shares at a price that hinged on Seminole's net asset value. Given the fact that Seminole owned some highly valuable assets, we would like to have seen a net asset value analysis.

Third, Mr. Tack assumed that Max Weitzenhoffer owned the largest block of Seminole stock on the valuation date and that the per-share value of the estate's shares equaled the per-share value of all other shares. We disagree with both of these assumptions. For starters, the parties stipulated and we have found as a fact that the estate owned the largest block of Seminole stock; i.e., Max Weitzenhoffer and the estate respectively owned 17.30 and 19.86 percent of Seminole's outstanding stock. Although Mr. Smith testified that he and Max Weitzenhoffer considered Max the owner of the shares of his mother, Clara, because she was very old and Max was an only child, we decline to do likewise. It is indisputable that Clara's shares were owned by her, and it is inappropriate to attribute her shares to him. In addition to the well-settled rule that stock is valued without the use of family attribution, see Propstra v. United States, 680 F.2d 1248 (9th Cir. 1982); Estate of Bright v. United States, 658 F.2d 999 (5th Cir. 1981); Estate of Mellinger v. Commissioner, 112 T.C. 26 (1999); Estate of Andrews v. Commissioner, 79 T.C. at 953, Mr. Smith testified

adamantly that Clara made her own decisions and that her advisers were independent of Max and his advisers.[8]  While Mr. Smith also testified cursorily that Max voted Clara's shares by proxy, we give this testimony no weight.  But for the testimony of a person who is neither a director nor shareholder of Seminole to the effect that Max voted Clara's shares by proxy, we find nothing in the record to support a finding that Max held a proxy to vote Clara's shares.  Not to mention that even if he had voted her shares by proxy on previous occasions, proxies are generally revocable and of limited duration so as to deprive the holder of any control over the underlying shares.  See, e.g., Okla. Stat. Ann. tit. 18, sec. 1057 (West 1986).

Nor do we agree with Mr. Tack that each share of the estate's stock necessarily equaled the per-share value of the stock of any other shareholder.  As we understand Mr. Tack's analysis, shares of stock have one of two values.  They have one value, Mr. Tack states, if they represent a controlling interest in that the shareholder has the "ability to change corporate bylaws, determine dividend policies, redeploy corporate assets, change the company's capital structure, effect a sale or other change in the company's ownership structure, make personnel changes, and otherwise influence the operations and financial structure of the company."  They have a second value, Mr. Tack

---

[8] We also are unpersuaded that Clara Weitzenhoffer had any obligation as of the applicable valuation date to leave her shares to her son Max.

continues, if they represent any other interest, or, as he puts it, they represent a noncontrolling interest.

While we agree with Mr. Tack that the type of controlling interest to which he refers is usually worth more than that of another interest in the same company, we disagree with him that corporate stock may be pigeonholed into one of two values. The element of control is not as cut and dried as Mr. Tack would have it seem. Although the per-share value of a block of stock that guarantees the holder that he or she can name all board directors is usually greater than that of a block of stock that carries with it the ability to name no directors, the per-share value of the latter block may not necessarily be the same as that of a block that carries with it the right to name one but not all directors. Nor is the per-share value of the one-director block necessarily the same as a block that carries with it the right to name two but not all directors. The long and short of stock valuation is that the unique facts of each case dictate the value that attaches to a block of stock, and the per-share value of one block may differ from the per-share value of another block even when neither block represents a majority interest in the corporation. An important factor to consider in determining whether extra value inheres in one minority interest vis-a-vis another is the extent to which the holder of the minority interest has the ability, by virtue of his or her ownership interest in the company, to influence the company's practices or

policies.[9]  See generally Pratt et al., Valuing A Business:  The
Analysis and Appraisal of Closely Held Companies 44 (3d ed.
1996), where the authors state:

> The distribution of ownership can affect the value
> of a particular business interest.  If each of three
> shareholders or partners owns a one-third interest, no
> one has complete control.  However, no one is in a
> relatively inferior position unless only two of the
> three have close ties with each other.  In this
> situation, the analyst could recognize that the size of
> the discount from pro rata value for each equal
> interest normally will be less than that for a minority
> interest that has no control whatsoever.

Here, an owner of the estate's shares, although not an owner
of a majority interest in Seminole, has the ability to exert
influence over Seminole's operation, although not necessarily
control it, by virtue of the fact that he or she is the largest
single owner of Seminole stock.  We find that an owner of the
estate's stock has the right to name at least one of Seminole's
five directors.[10]  The owner need only vote 38,624 of his or her

---

[9] We do not depart from firmly established law that a
minority interest in a business is valued by taking into account
a minority interest discount.  See, e.g., Estate of Bright v.
United States, 658 F.2d 999 (5th Cir. 1981); Estate of Newhouse
v. Commissioner, 94 T.C. 193, 249 (1990); Ward v. Commissioner,
87 T.C. 78, 106 (1986); Estate of Andrews v. Commissioner,
79 T.C. 938, 953 (1982).  We simply hold that the per-share value
of the estate's shares, as the largest block of Seminole stock,
is not necessarily the same as the value of any other Seminole
share.

[10] In fact, such an owner could end up electing two or more
board members.  The record indicates that Seminole did not inform
all of its shareholders about its operation, including the time
and place of annual meetings.  Thus, all of Seminole's
shareholders did not necessarily attend its annual meetings, the
result being that the total shares voted thereat may have been
fewer than the outstanding voting shares.

shares to elect a designate to the board.[11] Whereas Mr. Tack stressed the fact that the subject shares lacked current representation on the board in reaching his conclusion that the shares' per-share value was the same as that of any other share, we attach less weight to this fact. The mere fact that none of the executors of the estate was a member of the board on the applicable valuation date does not mean that a holder of the estate's shares lacked the ability to gain representation on the board had he or she wanted to. It is of course understandable that decedent was not a member of the board when she died, seeing that she was elderly and most likely not desirous or capable of sitting on the board.[12]

Fourth, Mr. Tack ignored the value that inured in the estate's shares on account of the fact that Seminole was a family-owned business that was intended by the shareholders to be kept in the family. Most of Seminole's shareholders were related to the Weitzenhoffer family by blood or by marriage, and they

---

[11] Because the record does not contain Seminole's bylaws or certificate of incorporation, we are left to assume for purposes of this calculation that all shares of Seminole stock carry one vote and that all directors are elected at the same time.

[12] Petitioners ask the Court to find as a fact that Max Weitzenhoffer, Elizabeth Weitzenhoffer Blass, and John Gunzler voted together in a concerted effort to control the affairs of Seminole. We decline to do so. Although Messrs. Reeves and Smith did testify that they believed that Max Weitzenhoffer, Elizabeth Weitzenhoffer Blass, and John Gunzler tended to vote similarly at board meetings, this hardly supports a finding that these three did so pursuant to some type of voting agreement. That the three may have voted similarly in the past may simply mean that they had a similar mind set or philosophy on the matters before them at the time.

went to great lengths to assure that the shares held by an outsider could not be transferred to another outsider. Every shareholder who was outside the extended Weitzenhoffer family was a Seminole employee (or spouse thereof in the case of Ms. High), whose shares had to be redeemed when the shareholder retired. It is not unreasonable under the facts herein to conclude that a hypothetical buyer of the estate's shares would contemplate that a member of the Weitzenhoffer family, or Seminole itself, would pay a greater price for those shares as long as they were owned by a nonfamily member who was not an employee. A closely held family corporation such as Seminole is typically managed with little formality and with little concern for the respective ownership interests of family member shareholders. Adding a nonfamily shareholder minus conditions under which his or her shares may be recalled can cause havoc to the business' harmonious operation. The nonfamily shareholder, for example, may demand a return on his or her investment that the family member shareholders are unwilling to give, may otherwise create an unpleasant and unrewarding working environment, or may strive to acquire a majority of the outstanding shares. See O'Neal & Thompson, O'Neal's Close Corporations sec. 7.02 (3d ed. 1994). A nonfamily shareholder also may continually second-guess the actions of a family shareholder, director, or officer, or group thereof, as unlawful attempts to usurp the rights of a minority shareholder in favor of the family. See Pepper v. Litton, 308 U.S. 295, 306 (1939); Southern Pac. Co. v. Bogert, 250 U.S.

483, 492 (1919); see also <u>Zahn v. Transamerica Corp.</u>, 162 F.2d 36, 42 (3d Cir. 1947) (discusses fiduciary duty generally owed by those in control of a corporation); <u>Warren v. Century Bankcorporation, Inc.</u>, 741 P.2d 846, 849 (Okla. 1987), and the cases cited therein (Oklahoma recognizes the applicability of <u>Pepper v. Litton</u>, <u>supra</u>, in its jurisdiction). Litigation, and the vast expense thereof, may ensue whenever disgruntled minority shareholders believe that they have been wronged by a group of shareholders or officers who purportedly control the corporation. In contrast to years past, minority shareholder complainants today are real, omnipresent, and numerous. As recognized by Professors O'Neal and Thompson in their treatise on minority shareholder litigation:

> Most American lawyers do not realize the tremendous amount of litigation in this country arising out of shareholder disputes. Since the publication of the first edition of this treatise, the volume of litigation grounded on minority shareholder oppression--actual, fancied, or fabricated--has grown enormously, and the flood of litigation shows no sign of abating. The increase in litigation has been pronounced in both federal and state courts * * *. Also worthy of note is that in the last four or five years there has been a substantial increase in the number of suits minority shareholders have brought for involuntary dissolution of their corporation or to force majority shareholders to purchase their shares. [1 O'Neal et al., O'Neal's Oppression of Minority Shareholders v (2d ed. 1997).[13]]

---

[13] Were the family forced to buy the estate's shares at the appraised price calculated under applicable State (Oklahoma) law, the family would have to pay the price that was determined by weighing the values derived under the three valuation methods mentioned above. See <u>Foglesong v. Thurston Natl. Life Ins. Co.</u>, 555 P.2d 606, 610-611 (Okla. 1976). Oklahoma law prohibits

(continued...)

Seminole was an attractive investment from both an income and growth point of view. Seminole's industry was very competitive, and Seminole was a firmly based, prosperous company that was a leader in its industry and projected to continue its profitability. Seminole's industry also was thriving as a result of business acquisitions. Given the added fact that some of Seminole's shareholders (e.g., Mr. Hoffman and Ms. Branch) were contemporaneously interested in selling their Seminole shares, it is reasonable to conclude that a hypothetical buyer could have anticipated as of the applicable valuation date that an investor would buy the hypothetical buyer's shares to allow the investor to place itself in position more suited to acquiring the company in full. We bear in mind that the estate's shares were not merely growth shares as Mr. Tack assumed. Seminole had budgeted and was expecting to pay dividend income of $59,580, $71,496, and $95,328 in 1994 through 1996, respectively, with respect to the shares held by the estate.

Mr. Tack assumed that the estate's shares lacked any market. We disagree. The shares were marketable in that a hypothetical holder thereof could most likely sell his or her large block of stock to a suitor of the company, to a member of the Weitzenhoffer family (such as Max Weitzenhoffer, who was actively seeking to increase his interest therein), or to Seminole itself.

---

[13](...continued)
reducing this price by a minority interest discount. See Woolf v. Universal Fidelity Life Ins. Co., 849 P.2d 1093, 1095 (Okla. Ct. App. 1992).

Mr. Tack never considered Seminole's competitors or Weitzenhoffer family members potential buyers of Seminole stock. Nor did he consider Seminole as a potential buyer, let alone the fact that Seminole had previously redeemed its stock from retiring employees pursuant to an obligation to do so. Neither Mr. Tack nor the record tells us the price at which Seminole redeemed or was obligated to redeem its shares (or a formula under which this price was computed). The price that a corporation must pay pursuant to a mandatory redemption plan may be a key determinant of the stock's fair market value. Not to mention that a holder of the estate's stock could find himself or herself a majority shareholder were Seminole to redeem enough of its shares. We do not know which shareholders, but for Messrs. Reeves, Gunzler, Threadgill, and High, were Seminole employees. Nor do we know to what extent the estate's ownership interest would increase were the shares of all Seminole employees to be redeemed.

Fifth, Mr. Tack neglected to set forth in his report the features of the class A and class B shares, other than to state that management had represented to him that these shares are virtually identical.[14] Mr. Tack, like Merrill Lynch, ascertained

---

[14] The record disproves this representation. Mr. Tack's initial report, for example, states that management had represented to him that the class A shares were identical to the class B shares, except that class B shares were held by employees and were required to be redeemed. In addition to the fact that Messrs. Reeves, Gunzler, Threadgill, and High all owned class A shares and all were employees, Seminole's financial statements, which were certified by Ernst & Young, state that any common stock held by a shareholder/employee is subject to redemption
(continued...)

the value of Seminole stock by treating the two classes as one. Seminole's by-laws and certificate of incorporation are not in the record, and the record as built by the parties leaves us unpersuaded that the rights of the holders of the two classes of stock to vote, to receive dividends, and so forth, are identical. See generally Okla. Stat. Ann. tit. 18, secs. 1006 A.4. (certificate of incorporation must generally set forth differences between classes of stock), 1013 B. (contents of bylaws), 1032 (classes and series of stock) (West 1986).

Nor did Mr. Tack address the question of whether Seminole's class A shareholders had cumulative voting. Cumulative voting may add value to shares of stock. Cumulative voting gives each share as many votes as there are directors to be elected and allows a shareholder to cumulate his or her votes by casting them all for one director, or distributing them as he or she sees fit. See generally Okla. Stat. Ann. tit. 18, sec. 1059 (West 1986) (certificate of incorporation may provide for cumulative voting). Cumulative voting may allow a minority shareholder to maximize his or her representation on a board. Although petitioners ask the Court to find, on the basis of a colloquy between their counsel and Mr. Reeves, that Seminole did not have cumulative voting, we decline to do so. The colloquy, which incorrectly sets forth an example that does not involve cumulative voting, is as follows:

---

[14](...continued)
upon his or her termination of employment.

Q  Based upon your participation as a shareholder and Director, when you participated in these elections as a shareholder or Director, were they conducted under cumulative voting or non-cumulative voting?

A  I get the terms sometimes mixed up.  But I do know that it is such that if somebody owns 25 percent of the stock, for an example, they do not receive 25 percent of the Board members.  And I believe that is what you call non-accumulated voting.

Q  That's my understanding as well.

In sum, we are unpersuaded by Mr. Tack's opinion and reject it.  Having done so, we would typically proceed to value the estate's shares on the basis of the record at hand.  In the typical case, we find much information and data on the subject corporation, as well as financial studies and data which allow us to compute value and marketability discounts using the Mandelbaum and other factors mentioned above.  The instant case, however, is atypical.  Petitioners, in short, ask us to close our eyes to the inadequate record and adopt without adequate verification Mr. Tack's conclusion and the managerial representations upon which he relied.  We decline to do so.  Valuation cases require that we determine a value based on the evidence at hand.  Whereas we may determine a value with the assistance of experts, if we consider it helpful, we will not accept an expert's conclusion when it is unsupported by the record.  The record must be built by the parties to include all data that is necessary to determine the value of property in dispute.  Valuation experts must perform unbiased and thorough analyses upon which we may rely.  Where, as

is the case here, the record falls short of the standard which we require, we are left to decide the case against the party who has the burden of proof. Because petitioners bear the burden here, we sustain respondent's determination, as modified by concessions in brief. We hold that the fair market value of the estate's stock was $56.50 per share on the applicable valuation date.

We have carefully considered all arguments, and, to the extent not discussed above, find them to be irrelevant or without merit. To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.